*1277
 
 CARAWAY, J.
 

 1,After the plaintiffs left the employment of the defendants’ loan business, they were accused by defendants of theft. The theft accusations led to plaintiffs’ arrest; yet the prosecution against them was dismissed nine months later. Plaintiffs then instituted this action for malicious prosecution against defendants. Following a bench trial, the trial court rendered judgment in plaintiffs’ favor, and the defendants appeal. Finding no manifest error in the trial court’s judgment, we affirm.
 

 Facts
 

 Plaintiffs, Deborah LeBlanc and Teri Shirey, were employed by Cash Back Loans, L.L.C. (“Cash Back”), doing business as Payday Money with locations in Bossier City and Leesville. Payday Money is a high-interest, short-term loan company owned by defendant Ray Pynes of Leesville. LeBlanc and Shirey were employed as manager and loan officer respectively at the Bossier office. In November 2004, they were the only employees at the Bossier store. Defendant, Linda Mills, was the “manager” at the Leesville location.
 

 In a telephone conversation on November 30, 2004, Pynes fired LeBlanc due to the poor collections performance of the Bossier office. Pynes authorized LeBlanc to write herself a check for the salary she was owed up to that day, for vacation time she had accrued, and for an additional two weeks’ pay as a severance agreement. Le-Blanc wrote herself the check. When Le-Blanc was fired, she had outstanding personal loans with the company totaling $1,175.12.
 

 |2In the weeks prior to LeBlanc’s termination, Pynes had asked Shirey if she wanted to assume the manager position once he let LeBlanc go. Shirey testified that she spoke to Pynes over the phone immediately after he fired LeBlanc and claimed to tell Pynes that she did not feel comfortable taking over LeBlanc’s position. Shirey then resigned the same day LeBlanc was fired. She left a letter of resignation on the desk but did not communicate her resignation in any other way to Pynes. Prior to leaving the office, Shi-rey also received her final wages and accrued vacation pay by a check written by LeBlanc. The resignation letter indicated that the check received by Shirey reflected a deduction for a portion of the money she owed to Payday Money. After the firing and resignation, the Plaintiffs left the office and deposited the business cash at the bank. At the time of Shirey’s resignation, she had outstanding personal loans which she repaid after her subsequent arrest.
 

 After Pynes fired LeBlanc, he claimed that he did not know that Shirey had resigned. He was unable to contact her, and eventually discovered that his office had been shut down after contacting the neighboring pizza shop. Pynes and Mills traveled to Bossier the next day to open the office and hire new employees. Mills remained in Bossier for several weeks. The Defendants testified that the Bossier office’s records were extremely unorganized when they arrived. There were computer loan records pertaining to Shreveport customers kept separately from the records for the Bossier customers. During this time, Mills combined the accounts of Shreveport and Bossier customers into one computer system.
 

 | a While reorganizing and combining the accounts, Mills allegedly uncovered evidence of 19 loans, in 16 different customers’ names, which she suspected to be “bogus” loans. The outstanding balances
 
 *1278
 
 on the loans totaled approximately $3,800. Mills suspected that the Plaintiffs had stolen the principal amount of the unauthorized loans. She also uncovered evidence of multiple personal loans that LeBlanc and Shirey had taken out in their names and in the names of members of their families.
 

 During this time of investigation, Mills was in constant contact with Pynes and reported her findings to him daily. Mills indicated to Pynes that she believed the discrepancies were consistent with a pattern of internal theft similar to schemes she had seen previously while working for a different lending institution. He instructed her to review the documentation again and to contact the police if she felt that a theft had occurred.
 

 On March 17, 2005, Mills reported the alleged theft to the Bossier City Police Department. Patrol Officer Lindsey Kutz met with Mills and created the initial police report. Detective Shane Waites later took over the investigation. Waites interviewed Mills once in person and multiple times over the phone. Mills also provided him with documentation to support her assertion that the Plaintiffs had committed an internal theft.
 

 Based on Mills’s statements and the documentation that she provided, Waites arrested LeBlanc and Shirey on May 3, 2005, and charged them with felony theft. Both Plaintiffs spent that night in jail. They then posted bail and were released the following afternoon. Following the incarceration, Plaintiffs made approximately nine court appearances in which they were | represented by multiple court-appointed attorneys. Shirey eventually borrowed money to hire an attorney. On February 13, 2006, the charges against both Plaintiffs were ultimately
 
 nol prossed
 
 by the Bossier District Attorney’s office.
 

 On May 1, 2006, LeBlanc and Shirey filed this action against Pynes and Mills for malicious prosecution, defamation, and intentional infliction of emotional distress. Cash Back was made an additional defendant by amended petition. A bench trial was held on two days in May and August of 2009.
 

 The trial testimony and documentary evidence indicated that Mills’s investigation into the 19 loans was inadequate. Evidence also indicated that some of the documentation that Mills provided to the police was likely fabricated. Testimony from three of the “bogus” loan customers indicated that they did in fact have legitimate loans from the Bossier office and that Mills had not contacted any of them prior to Plaintiffs’ arrests. Kristi Hart, one of the suspected “bogus” customers, testified that she had legitimate loans and had made payments toward those loans prior to the time that Mills spoke with the police. Evidence presented indicated that Mills did not provide the police with the information regarding Hart’s loan payments. Another “bogus” customer who testified at trial, Lorraine Wilson, had her legitimate loan discharged in Chapter 7 bankruptcy. At trial, Detective Waites testified that he primarily relied on Mills’s statements and the documentation she provided to build the case against the Plaintiffs.
 

 |fiIn written reasons, the trial court found Pynes and Mills liable for malicious prosecution and defamation. In the ruling, the trial court made the following statement with which the Defendants take issue:
 

 The evidence produced at trial -by the defendants was soundly rebutted by the plaintiffs and fell short of proving any of the allegations by Linda Mills to the Bossier City Police Department even by
 
 *1279
 
 a preponderance of the evidence, much less beyond a reasonable doubt.
 

 The trial court’s judgment awarded Shi-rey $16,615.71 in special damages and $25,000 in general damages. The trial court’s opinion indicated that the special damages included awards of $685.00 in bail fees, $40.00 for the indigent defender board fee, $22.25 for copy fees, $4,368.46 for the deficiency judgment on the repossession of an automobile, $1,500 in attorney’s fees, and $10,000.00 for loss of future income. LeBlanc was awarded $10,747.25 in special damages and $20,000 in general damages. LeBlane’s special damages included $685.00 in bail fees, $40.00 for indigent defender board fees, $22.25 for copy fees, and $10,000 for loss of future income. Total damages awarded equaled $72,363.96. Defendants subsequently filed a motion for a new trial. The motion was granted in part, so as to add as an additional judgment debtor, Cash Back. Defendants now appeal.
 

 Discussion
 

 I.
 

 In the Defendants’ first two assignments of error, they argue that the Plaintiffs failed to prove malice, the Defendants’ falsification of the charges, or their intent to mislead the police. They also argue that the trial court’s [¿written ruling revealed that “it imposed a burden of proving the criminal charges against the Plaintiffs on the Defendants beyond a reasonable doubt, rather than merely requiring a showing of probable cause, in both the malicious prosecution and defamation claims.” In that connection, they assert protection of “a conditional privilege for reporting criminal conduct to the police with no intent to mislead.”
 

 Never favored in our law, a malicious prosecution action must clearly establish that the forms of justice have been perverted to the gratification of private malice and the willful oppression of the innocent.
 
 Johnson v. Pearce,
 
 313 So.2d 812 (La.1975).
 

 A successful claim for malicious prosecution requires proof of six elements: 1) the commencement or continuance of an original criminal or civil judicial proceeding; 2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; 3) its bona fide termination in favor of the present plaintiff; 4) the absence of probable cause for such proceeding; 5) the presence of malice therein; and 6) damages conforming to legal standards resulting to plaintiff.
 
 Hibernia Nat’l Bank of New Orleans v. Bolleter,
 
 390 So.2d 842 (La.1980);
 
 Robinson v. Goudchaux’s,
 
 307 So.2d 287 (La.1975);
 
 Arledge v. Sherrill,
 
 32,189 (La. App.2d Cir.8/18/99), 738 So.2d 1215, 1222,
 
 writ denied,
 
 99-2713 (La.12/10/99), 751 So.2d 255. The Defendants concede the first element but contest the remaining five.
 

 It is well settled that an appellate court may not set aside a trial court’s finding of fact “in the absence of manifest error or unless it is clearly |7wrong.”
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989),
 
 citing Arceneaux v. Domingue,
 
 365 So.2d 1330, 1333 (La.1978);
 
 Canter v. Koehring Co.,
 
 283 So.2d 716, 724 (La.1973); see
 
 also, Sevier v. United States Fidelity & Guar. Co.,
 
 497 So.2d 1380, 1383 (La.1986);
 
 West v. Bayou Vista Manor, Inc.,
 
 371 So.2d 1146, 1150 (La.1979);
 
 Davis v. Owen,
 
 368 So.2d 1052, 1056 (La.1979);
 
 Cadiere v. West Gibson Products Co., Inc.,
 
 364 So.2d 998, 999 (La.1978). Further, “reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review.”
 
 Rosell, supra.
 

 
 *1280
 
 The primary criminal charge, for which the Plaintiffs were arrested, was that the Plaintiffs created so-called “bogus” loans and then stole the cash that would have funded those loans. Mills reported to the police 19 such loans which stood in the names of 16 customers. The initial police report stated:
 

 Mills said that they have found several loans that are in customer’s [sic] names, that have used the business, but when the customer is called, they don’t know anything about the loan.
 

 Additionally, the police reports reflect that Mills reported that Plaintiffs “were not allowed under any circumstance to withdraw a loan in there [sic] name.” Yet, the Plaintiffs had “taken out ... numerous loans” in violation of that policy. Finally, the reports also identified vaguely “an internal theft of money” for which Plaintiffs were suspected. Mills later denied making that charge to the police.
 

 At Payday Money, there were no written office policies. However, there were loan authorization procedures that were passed down from | ^employee to employee. According to Shirey and LeBlanc, when a customer applied for a loan, several documents were required. Those included a check stub for the customer’s account, a driver’s license or some form of identification, a bank statement, and a bill with the customer’s address. Also, for the “bogus” loan customers, there were social security numbers for each. Additionally, an employee would then run a Tel-A-Track report, which is similar to a mini-credit check. If the customer is approved for the loan, the customer would then be required to write a check for the principal and interest and sign a standardized loan contract. The office would file and retain the check as “collateral” until the loan was due. Mills explained that the checks were filed in a “check box” that was organized according to the due date of the loan. When the due date arrived and the loan was delinquent, the office would deposit the check. Checks that were returned for insufficient funds were filed in a separate “NSF check box.”
 

 The loan proceeds for the Payday Money loans were not disbursed by check. Instead, cash was maintained in the office for funding the loans. Each week Pynes received reports for the new loans and the delinquent loans. The charge of theft from the “bogus” loans was thus not based upon any accounting discrepancies identified by the cash withdrawal and deposit records of the business account. In fact, Defendants did not present the bank account records for the business into evidence.
 

 Regarding the “bogus” loans, Mills provided inconsistent testimony on whether she actually attempted to contact the customers whose personal data were allegedly used by Plaintiffs in setting up the “bogus” loans. | nlnitially, she told Detective Waites that she had attempted to contact the customers but was unable to reach any of them. Yet, in her deposition she stated that she did not try to contact any of them. Later, at trial, she testified that she did try, unsuccessfully, to contact some of them. Plaintiffs were able to contact and obtain affidavits from several of the “bogus” loan customers in preparing their defense for the criminal trial. To contact these customers, the Plaintiffs used the actual information that Mills provided to the police, information which they obtained through discovery for the criminal case.
 

 Of the 19 loans that Mills reported to the police, at least four originated at a time when Shirey was not employed by
 
 *1281
 
 Payday Money. At least one of the 19 originated in December 2004 after Le-Blanc was fired and after Shirey resigned. In March 2004, as Mills first contacted the police, Kristi Hart, one of the “bogus” loan customers, made a partial payment on a loan. Of the 14 remaining “bogus” loan customers, the record reflects the statement or affidavit of 7 of those customers admitting the loans in question. Finally, some of the “bogus” loans were shown as new loans in the documentation provided to the police when in fact the loans were renewals. When questioned about this evidence, Mills submitted that there may have been some mistakes due to the disorganization of the office.
 

 Regarding the Plaintiffs’ personal loans, Mills initially told the police that she was a regional manager and that employees such as Plaintiffs were not allowed to take out any personal loans. She later testified that she was not a regional manager and that the employees were not prohibited fromJjjjtaking out loans. The police report also indicated that Mills said that there was no documentation relating to Shirey’s personal loans, when in fact there were copies of Mr. and Mrs. Shirey’s driver’s licenses and check stubs on file. Shirey’s •written letter of resignation contained clear acknowledgment of her debt to the business. Mills testified that the police misunderstood her.
 

 Did the Legal Causation for the Criminal Prosecution Result from Defendants’ Actions?
 

 To fulfill the second element for the legal causation of malicious prosecution, the original defendant must have caused the prosecution. An independent investigation by law enforcement of a complaint made by a citizen may break the chain of causation between the complaint and the ultimate commencement of a criminal proceeding.
 
 Adams v. Harrah’s Bossier City Inv. Co., L.L.C.,
 
 41,468 (La.App.2d Cir.1/10/07), 948 So.2d 317, 320,
 
 writ denied,
 
 07-0639 (La.5/11/07), 955 So.2d 1281. However, there are cases in which there may not have been enough of an intervening police investigation to break the chain of causation.
 
 See, Craig v. Carter,
 
 30,625 (La.App.2d Cir.9/23/98), 718 So.2d 1068, 1070,
 
 writ denied,
 
 98-2698 (La.12/18/98), 734 So.2d 636.
 

 In this case, Detective Waites testified that the arrest and charges against the Plaintiffs were based solely on the information Mills provided him. This testimony did not indicate a separate, independent investigation to such a degree that the chain of causation is broken. Significantly, the details, documentation, and accounting procedure that might justify a belief that $3,800 had been stolen through the “bogus” loan process were not | n apparently clear to the officers. In Detective Waites’s police report concerning the arrest, he listed only the dollar amounts for the Plaintiffs’ “unauthorized loans” to themselves as the basis for each charge of theft. Yet, a loan allowance for each Payday Money employee was permitted in the business. Therefore, the arrests made on the basis that such loans were “not allowed under any circumstances” were caused by the inaccuracy of Mills’s statements. The second element of legal causation is fulfilled.
 

 Was there a Bona Fide Termination of the Criminal Proceeding?
 

 To fulfill the third element of malicious prosecution, the original case must have been legitimately terminated in favor of the present plaintiff. A
 
 nolle prosequi
 
 has been held to constitute a bona fide termination.
 
 Banken v. Locke,
 
 136 La. 155, 66 So. 763 (1914).
 

 
 *1282
 
 The continuation of a criminal proceeding by the prosecution would be an impediment to a malicious prosecution claim against the party reporting the crime to the police. Such impediment had ended when this action commenced. We disagree with Defendants’ assertion that the prosecution’s perception of the merits of the criminal case against the Plaintiffs at the time of its dismissal had to be proven by the Plaintiffs, suggesting that the district attorney must testify as to the use of his prosecutorial discretion. When proven by a plaintiff, the other elements for the malicious prosecution cause of action, as reviewed below, demonstrating the defendant’s lack of probable cause and his malice, are sufficient to show that the state’s dismissal of a criminal action was a “bona fide” dismissal. Additionally, we note that the law enforcement official who | ^testified at trial, Detective Waites, indicated that the lack of evidence led to the dismissal of the criminal actions.
 

 Was there an Absence of Probable Cause for the Criminal Proceeding?
 

 The jurisprudence demonstrates that this element of probable cause focuses on the present defendant’s mindset in instituting the original action against the plaintiff.
 
 Robinson, supra; Hibernia Nat’l Bank of New Orleans, supra; Young Oil Co. of Louisiana, Inc. v. Durbin,
 
 412 So.2d 620 (La.App. 2d Cir.1982). “Probable cause focuses as much on the reasonable state of mind of [the defendant] in bringing the charge as the actual fact.”
 
 Young Oil of Louisiana, Inc., supra
 
 at 627. Did the complainant have an honest and reasonable belief in the guilt of the accused when he pressed charges?
 
 Jones v. Soileau,
 
 448 So.2d 1268 (La.1984).
 

 In
 
 Robinson, supra,
 
 the Supreme Court found a department store liable for malicious prosecution for failing to advise its attorney that a collection action against a customer was no longer needed after the customer’s payment of the account. Addressing the department store’s lack of probable cause for the institution of the proceeding, the court said:
 

 There was, therefore, insofar as [the defendant was] concerned, a total want of probable cause for instituting suit to collect an account fully paid eight months before.
 

 This probable cause analysis of the complainant/tortfeasor’s state of mind applies equally in the wrongful institution of either a civil or
 
 criminal
 
 proceeding. Therefore, it must be distinguished from the “probable cause” analysis of the law enforcement officials’ mindset in making the plaintiffs arrest under the influence of the complainant/tortfeasor who is ultimately 11Rdetermined to have harbored malice or been reckless in presenting the charge to police. For this fourth element of the cause of action for malicious prosecution— the absence of probable cause for such proceeding — the police’s state of mind upon receiving the complaint is not crucial. Any arrest and prosecution followed by a bona fide termination of the criminal action allows for the proof of the complainant’s lack of probable cause and malice in making the charge.
 

 Regardless of the question of actual malice or an ulterior motive of Mills and Pynes, their decision to present the charge of theft to the police was based upon a drastic insufficiency of facts to justify a reasonable belief of theft. The overall loose cash accounting system of Payday Money required that Mills contact the 16 “bogus” loan customers to determine that a cash advance was not made to each, and therefore presumably pocketed by Plain
 
 *1283
 
 tiffs. Mills and Pynes understood the weakness of the accounting and internal controls for the business and could not reach a reasonable conclusion about theft under the circumstances. The evidence supports the trial court’s ruling of the Defendants’ absence of probable cause in seeking the arrests.
 
 [1]
 

 Was there Proof of Malice?
 

 Even in the absence of a showing of the department store’s ill will or ulterior motive, the Supreme Court in
 
 Robinson, supra,
 
 made the following observation about malice:
 

 114Negligence is not malice ordinarily, but when, in this case, it amounts to recklessness and inexcusable indifference of the rights of plaintiff, malice is presumed.
 

 Robinson, supra
 
 at 290 (citations omitted).
 

 As discussed above, the Defendants’ absence of probable cause was apparent from the deficiencies in their own accounting system. Thus, the Defendants demonstrated a recklessness and inexcusable indifference in accusing Plaintiffs under those circumstances.
 

 Moreover, the trial court as fact finder could determine from the circumstantial evidence an ulterior motive or malice underlying the Defendants’ pressing for the Plaintiffs’ arrests. Mills did not make a reasonable and suitable inquiry of the 16 customers, and certain blatant problems and inaccuracies with the 19 reported loans could be considered by the fact finder as a false reporting to the police. The undisputed fact that employees could have personal loans with the company was not the report given to the police. The inconveniences resulting from the Plaintiffs’ abrupt shutting down of the business and the delinquencies in their personal loans circumstantially raised the possibility of ill will by Mills and Pynes. Mills’s credibility was impeached by her prior statements and inconsistencies. Finally, Derona Walton, who had become employed at Payday Money, testified that Mills stated that “she was going to get [LeBlanc and Shirey],” around the time of the pending criminal proceedings.
 

 115Accordingly, under the manifest error standard of review, the trial court’s determination of malice and its finding of the tort of malicious prosecution is affirmed.
 
 [2]
 

 II.
 

 The Defendants also assign as error the trial court’s award of damages. They contest the special damage award for lost income and for the $4,368.46 award resulting from the deficiency judgment in the repossession of Shirey’s automobile. Defendants also assert the excessiveness of the general damage awards.
 

 In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury. La. C.C. art. 2324.1. This general principle is further
 
 *1284
 
 noted in La. C.C. art. 1999 which states, “When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages.” The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257 (La.1993). The discretion left with the trier of fact is great, and even vast, so that a court should rarely disturb an award for general damages.
 
 Id.
 
 Only when the award is beyond that which the trier of fact could assess for the effects for the particular injury that the appellate court should increase or reduce the award.
 
 Id.
 
 | 1fiWhen the factors necessary for a malicious prosecution cause of action have been satisfied, damages will be presumed.
 
 See Robinson, supra
 
 at 290.
 

 The Civil Code’s provisions for damages, addressed under the principles of conventional obligations, have application for the assessment of damages in tort. La. C.C. art. 1917 provides as follows: “The rules of this title [Title IV] are applicable also to obligations that arise from sources other than contract to the extent that those rules are compatible with the nature of those obligations.” In Title IV, Chapter 8 of the Civil Code, La. C.C. art. 1995 states that “[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived.” An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made, and an obligor in bad faith is liable for all the damages, foreseeable or not that are a direct consequence of his failure to perform. La. C.C. arts. 1996 and 1997. As noted in Official Comment (b) to Article 1997: “An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation.”
 

 Following the arrest, the Plaintiffs both suffered from self-described depression and sleeping problems caused by the embarrassment and shame of being arrested. Shirey testified that she did not leave her house for two months. In January 2005, Shirey applied for but was not offered a position with the Bossier City Police Department. She was not given a reason for not being offered that position. In October 2005, Mr. and Mrs. Shirey surrendered their car because they could no longer afford the monthly payment. Shirey eventually gained employment and health insurance as a 117receptionist at a law firm around March of 2006. She then visited two different doctors and was prescribed antidepressant, anti-anxiety and sleep aid medications on different occasions. However, Shirey did not tell either doctor about the arrest because she was “ashamed to admit that [she] had been arrested for felony theft.”
 

 LeBlanc also claims the arrest negatively affected her life. She sought medical attention and was prescribed antidepressant and anti-anxiety medications. Le-Blanc did not tell her doctor that she suspected that her depression and anxiety resulted from an arrest. LeBlanc secured employment through a temporary employment agency and was released when she told them she had been arrested. LeBlanc was later employed by LeBossier Hotel and then released when they discovered she had been arrested. LeBlanc has been receiving social security disability benefits for some time prior to a surgery she had in July 2006.
 

 Both women described their overnight stay in the Plain Dealing jail annex as profoundly disconcerting. Each testified to being traumatized by being handcuffed and shackled and having to shower and
 
 *1285
 
 use the bathroom in front of other people. The women were unable to sleep or eat during their time in the jail. Both women also expressed extreme embarrassment and humiliation after learning that their names and information regarding their arrests had been published in a local newspaper.
 

 Under the ruling in
 
 Youn,
 
 we do not find that the general damage awards to Plaintiffs demonstrate an abuse of the trial court’s “much discretion.” Plaintiffs’ arrests and incarcerations, and the stigma of the 118charge of theft caused them emotional trauma for which the trial court’s awards compensated. Likewise, the $10,000 award to each plaintiff for wage loss is an amount less than one year’s salary of a minimum wage worker. The Plaintiffs were arrested and their criminal prosecution remained pending for over nine months. During that time and thereafter, the wage earning capacity of each plaintiff was shown directly and circumstantially to have been damaged. Finally, regarding Shirey’s repossession of her automobile and subsequent deficiency, we find that loss directly related to the ordeal and within the broader scope of damages for this intentional tort.
 

 Conclusion
 

 For the foregoing reasons, the judgment of the trial court is affirmed. Costs of appeal are assessed to appellants.
 

 AFFIRMED.
 

 [1]
 

 . With this analysis of probable cause contrasting law enforcement's understanding with the Defendants' state of mind, we understand the trial court's challenged comment as pertaining to Bossier law enforcement's ultimate conclusions that this theft charge could not be proven in the criminal case. We find no error in the trial court's application of the burden of proof.
 

 [2]
 

 . With the finding of malice, a difficult burden for any plaintiff seeking redress for her arrest, the Defendants’ asserted privilege for reporting criminal conduct has no merit.